## IJAMS, Appellant, v. PROVIDENT SAVINGS LIFE ASSURANCE SOCIETY OF NEW YORK.

### In Banc, December 24, 1904.

1. **INSURANCE: Forfeiture of Policy: Damages: Inability To Obtain Further Insurance.** Where a life insurance company has wrongfully declared plaintiff's policies of insurance forfeited for nonpayment of an increased rate of premium from that charged at the time the policies were issued, he is not entitled to recover damages due to his inability to obtain further life insurance on account of his advanced age and physical condition. Such damages are too remote and speculative to constitute the foundation for a legal cause of action.

2. ———: **Level-Rate Policy: Meaning.** A level-rate policy to be renewed "upon the payment of the renewal premiums in accordance with the schedule rates less the dividends awarded thereon" is not an agreement that the policy will be renewed each year upon the payment of a definite sum fixed upon at the outset, but whether or not it may be renewed for that sum depends upon the dividend or earnings to be applied in bringing the schedule rate down to a level with the initial rate. In the actual working out of the plan, the "level-rate" is the schedule rate fixed by the policy, reduced by the earnings or dividend.

3. ———: ———: ———: **Understanding of Agent and Applicant.** The fact that the agent who took the application and the insured expected that an application of the earnings or dividends to the reduction of the schedule rates would bring those rates down to a level with the initial rate each year during the life of the insured, did not make that expectation a part of the agreement contained in a policy which said it would be renewed "upon the payment each year of the renewal premiums in accordance with the schedule rates, less dividends awarded hereon," for these words mean the schedule rate fixed by the policy for a person of the age of the insured at the time he desired the renewal, less the earning or dividend, and are themselves an expression of what the insured and agent understood a level-rate policy to mean.

4. ———: ———: **Fraud.** The fact that the dividend when applied to the schedule rate brought the schedule rate down to a level with the initial rate for seven years, and that the initial rate was for seven years accepted as the full renewal price without complaint or demand for more, does not show fraud nor indicate that the company was guilty of fraud upon the insured in permitting its agent to hold out to the insured the expectation that the earnings or dividends would reduce the schedule rates to the level of the initial rate during the life of the insured.

5. ———: ———: ———: **Knowledge of Insured.** An experienced business man, who at one time was himself an insurance agent, is supposed to know the difference between an "ordinary life" and a "level-rate" policy.

6. ———: ———: ———: **Technical Words.** Although the term "level-rate" as used in the application may be technical, yet the words providing for a renewal of the policy "upon the payment each year of the renewal premiums in accordance with the schedule rates, less the dividends awarded hereon," are not technical, and having been inserted in the policy, as were the schedule rates, and the policy having been delivered to the insured, and no effort made to induce him not to read the same, there is no reason, under the circumstances, for reversing the rule that prior parol negotiations are merged in the written contract subsequently made.

Appeal from Jackson Circuit Court.—*Hon. Edward P. Gates,* Judge.

AFFIRMED.

*Hollis & Fidler* for appellant.

(1) If plaintiff, after being deceitfully induced to take this insurance, and lulled into the belief for seven years that he had what he had applied for, and until his age and physical infirmities had become such that he could get no other insurance in a reputable company, is entitled to any relief at all, then undoubtedly the second count states a cause of action. The evidence offered in support of our contention, in so far as the condition of plaintiff is concerned, shows that plaintiff's physical condition is such that he would not be accepted by any reliable company as an insurable risk.

In cases of this kind the return of the premiums with interest is not the only measure of damages to which the plaintiff may be entitled. McKee v. Ins. Co., 28 Mo. 387; Smith v. Ins. Co., 64 Mo. 330; Brasswell v. Ins. Co., 75 N. C. 6; Ins. Co. v. Robinson, 54 Fed. 580. On the question of speculative damages, see Consolidated Coal Co v. Polar Wave Ice Co., 106 Fed. 798. (2) The court erred in taking the case made by plaintiff on the first count from the jury. On the undisputed evidence a case of fraud and deceit was fully made by plaintiff, and such a case as clearly presented a question of fact for the jury. There was no question raised about the sufficiency of this count in the petition and every allegation was proven. It seems to us that the citation of authorities on this proposition is useless. Wells v. Adams, 88 Mo. App. 215. As to plaintiff's right of recovery on such a count: Suess v. Ins. Co., 64 Mo. App. 1; McKee v. Ins. Co., 28 Mo. 383. The court could not have taken the case from the jury on the theory that parol evidence was inadmissible to prove this fraud and deceit. Ins. Co. v. Owens, 81 Mo. App. 201; Wright v. McPike, 70 Mo. 175; Lithograph Co. v. Obert, 54 Mo. App. 241; Hutchins v. Pettingill, 30 N. H. 30; Aultman v. Olson, 30 Minn. 450; Cagle v. Ins. Co., 78 Mo. App. 431; Laundry Co. v. Ins. Co., 151 Mo. 99 (this case overruling Jenkins v. Ins. Co., 58 Mo. App. 210, and Sharp v. Ins. Co., 51 Mo. App. 286); Wolf v. Ins. Co., 86 Mo. App. 580; Van Ravensway v. Ins. Co., 89 Mo. App. 73.

*Ed. E. Yates* also for appellant.

Since this case was sent to the court In Banc, the writer has discovered a case decided last year by the Supreme Court of North Carolina upon practically the same state of facts. The suit was against the same company, for the return of premiums paid on account of the same kind of fraud. Gawltney v. Provident Savings Life Assurance Society, 132 N. C. 925; s. c.,

33 Ins. L. J. 72. This case is very strong authority in our favor. Indeed our case is much stronger for the plaintiff than the North Carolina case, inasmuch as there the policy holder relied alone upon oral representations of the general agent who took the application; while in our case the agreement for a "level rate" premium is written in the application (which is expressly made a part of the contract of insurance) and in addition to this the president of the company participated in the fraud by his letter inducing the assured to believe that he had a policy, the premium upon which would remain stationary. It would seem from the great similarity between the case at bar and the North Carolina case that it is a settled policy upon the part of this insurance company to deceive its policy holders as to the character and effects of their contracts. A "layman" (even if he is not induced to refrain from reading his contract) is not estopped from claiming that the contract issued to him is not the kind for which he contracted, because: 1. He is a layman and unfamiliar with the technical language of life insurance policies; 2. He had the right to rely upon the language of the application as expounded to him, especially so because it is by the words of the policy made a part of the contract; 3. Because in point of fact it is exceedingly doubtful if the language of the policy, and the table of rates therein gives to respondent the right to increase the premium; 4. Because appellant relied implicitly upon the representations made by respondent's agent and president, which they knew to be false when making them.

*Wm. T. Gilbert* and *Karnes, New & Krauthoff* for respondent.

(1) The second count manifestly grounds the *ad damnum* upon an injury that the law does not recognize. The general rule of recovery is that if the insured elects to rescind the contract, the measure of re-

covery is the premium paid. Ins. Co. v. Garmany, 74 Ga. 51; Ins. Co. v. Wright, 33 Ohio St. 533; Ins. Co. v. McAden (Pa.), 1 Atl. 256; McKee v. Ins. Co., 28 Mo. 383; Hedden v. Griffin, 136 Mass. 229; Bishop v. Ins. Co., 35 Mo. App. 302; Suess v. Ins. Co., 64 Mo. App. 1; Supreme Council v. Black, 123 Fed. 650; Moncreif, Fraud and Misrepresentations, 214. In some some cases it is hinted that if the insurance attaches for any length of time, the premiums paid cannot be recovered back. Mailhoit v. Ins. Co., 32 Atl. 989; Zallee v. Ins. Co., 12 Mo. App. 111. Whatever the rule of recovery, whether it be the recovery of the premiums paid, or the value of the policy at the time of the wrongful forfeiture, there is no authority for the recovery of the premiums, and the recovery of damages. Parker v. Marcus, 64 Mo. 41. The second count of plaintiff's petition charges a loss which is too remote, too speculative; a loss which may be attributed to such an innumerable number of independent causes, that the law will not permit a recovery therefor. Stevens Lumber Co. v. K. C. Lumber Co., 72 Mo. App. 263; Austin v. Barrows, 41 Conn. 287. There cannot be any doubt but that the policies of insurance in this case took effect and that the appellant was insured for seven years. It is often said that an insured who has been induced to enter into a contract of insurance by fraud can elect to rescind the contract and recover back the premiums paid, or, continue the contract and sue for damages for the fraud. Here insured by his own act rescinded the contract, voluntarily put himself in the position of one without insurance, and seeks to recover both the sum of premiums paid, and the damages resulting from his rescission of the contract. Van Werden v. Equitable Life Assur. Soc., 99 Ia. 621, 68 N. W. 892; Hedden v. Griffin, 136 Mass. 229; 1 Biddle, Insurance, pp. 424, 435; 2 Sedgwick, Damages (8 Ed.), 439; Grinnell, Law of Deceit, p. 195.    (2)    The third and principal point in appellant's appeal is the alleged error

of taking the issue upon the first count from the jury. The sole question is whether plaintiff below had any evidence of fraud or deceit, practiced by the respondent or its agents, upon which a jury might have found that the plaintiff had been wrongfully deceived. The plaintiff was obliged to show actual fraud by misrepresentations, or practices to deceive, in order to recover on the first count. His ignorance of the contents of the policy would avail him nothing since the law requires him to read and know its statements. There is not one word of testimony suggesting intentional or unintentional fraud or deceit. Appellant got the identical policy he bargained for, the identical policy he applied for, the identical policy the respondent by its agents told him he was getting. Appellant does not show that the policy is different from that which the respondent's agent stated he would get, but after seven years of insurance he undertakes to say, that the policy is not what he now says he then thought it was. · Perhaps appellant misunderstood agent Mumford at that time. Suffice it, he should have not have so misunderstood him, because the plan of the policy was explicitly stated to him orally, and the policy itself states that a "level rate" policy is one whose rate will have a tendency to remain level on account of the operation of the guaranty fund. The meaning of the term "level rate" was explained to appellant during the negotiations, and it was explicitly defined in the policy. The testimony of appellant's own witness, which is not contradicted, explains the meaning, and his testimony is the best evidence. Fuller v. Ins. Co., 37 Fed. 163. The oral promise is merged in the written contract. In so far as either count of appellant's petition rests upon an alleged parol or prior contract, agreement or promise, he must fail because the application and policy state the whole contract of insurance. Ins. Co. v. Ruse, 8 Ga. 534; Ins. Co. v. Longley, 62 Md. 197; State ex rel. v. Hoshaw, 98 Mo.

358; Blaine v. Knapp & Co., 140 Mo. 241; Mfg. Co. v. Lumber Co., 81 Mo. App. 252. He accepted an unambiguous instrument and must be bound by its terms. Foster Woolen Co. v. Woolman, 87 Mo. App. 666. The failure of the prophecies of the insurer do not entitle the insured to avoid the contract. Hall v. Ins. Co., 12 Fed. 359; Ordway v. Ins. Co., 35 Mo. App. 434. Misrepresentations as to future events do not constitute such fraud or deceit that an action for damages will lie therefor. McFarland v. Railroad, 125 Mo. 253; Cunyus v. Guenther, 96 Ala. 564; Cornelius v. Ins. Co. (Ia), 84 N. W. 1037; Ins. Co. v. Mowry, 96 U. S. 544; Ins. Co. v. Lumber Co., 69 Pac. 936.

ROBINSON, C. J.—On the 4th day of September, 1900, plaintiff filed in the circuit court of Jackson county, the following petition in two counts:

"Plaintiff states that the defendant is and at all the dates hereinafter mentioned was a corporation, and as such doing a life assurance business in the State of Missouri; that on the fifteenth day of January, 1892, plaintiff applied to defendant for insurance upon his life in the sum of ten thousand dollars, payable at plaintiff's death to his wife, Martha L. Ijams, at an annual level-rate premium of $217.20 on the yearly renewable-term plan; that defendant on January 19, 1892, issued two policies of five thousand dollars each to cover the amount of said ten thousand dollars so applied for by plaintiff, and divided the premium to be paid, namely, $108.60, per annum on each of said policies.

"That at the time said application was made and said policies were issued and accepted, and as the sole inducement for plaintiff to accept the same and to pay the annual premium therefor, defendant represented to plaintiff that the premium agreed upon, to-wit, $217.20 per annum, should remain the same during the life of said policies and that said policies were level-rate pol-

icies and should be kept and maintained as such level-rate policies and no change made in the premiums agreed upon, and were the kind applied for by plaintiff in said application for insurance.

"Plaintiff avers that said application is in writing and is in the possession of defendant, and plaintiff is unable to get the same or a verified copy thereof to file with this petition.

"Plaintiff says that he had only a limited knowledge of the business of life insurance and wholly relied upon the representations of the defendant, believing them to be true, and solely on the good faith of said representations being true, namely, that said policies were yearly renewable-term level-rate policies, the premium to remain the same unchanged during the life of said policies as applied for by plaintiff, he accepted the same and paid the annual premiums and carried out his contract in all particulars as he had agreed to do, for the term of seven years, his said payments of premiums amounting in the aggregate to $1,520.40.

"That just prior to the nineteenth day of January, 1899, defendant notified plaintiff that he did not have level-rate policies, but that said policies were on the participating plan and that his premium would be raised to $312 per annum. That plaintiff tendered to defendant the annual premium agreed upon, which defendant refused to accept and declared said policies void for non-payment of premium, and declared the payments made by plaintiff forfeited, and wholly violated its contract with plaintiff as plaintiff had applied for and which the defendant led and induced plaintiff to believe it was making with him and upon which it had accepted his money for seven years.

"Plaintiff avers and charges the fact to be that the defendant wrongfully and fraudulently, with intent to cheat and defraud plaintiff, issued policies on said application, which were not level-rate premium policies as applied for by plaintiff, and falsely and fraudulently

made the false representations and statements aforesaid regarding said policies, knowing them to be false, to deceive plaintiff and lull him into the belief that he had what he had bargained for until such time as he had paid out the sum of $1,520.40 aforesaid, fraudulently intending at the time to raise said annual premium when plaintiff had become of an age where he could not get insurance and had parted with such an amount of money to defendant on this false and fraudulent scheme that he would prefer to stand the deceitful imposition rather than go uninsured and forfeit the premiums so paid.

"That plaintiff had no knowledge or information of this deceit on the part of defendant, or that its representations to plaintiff were false until about the first day of January, 1899, when plaintiff then continued to make tender of his said premium as agreed upon and endeavored to induce defendant to continue to carry out its said agreement so made with plaintiff, until he found he was without insurance and must lose all the money which had been so deceitfully and fraudulently taken from him by defendant, or seek redress in the courts.

"Wherefore plaintiff says that by reason of the wrongful, deceitful and fraudulent acts of the defendant as in the premises alleged, he has sustained damages in principal and interest paid to defendant up to January 19, 1899, in the sum of $1,839.68, with interest at six per cent on said amount from said date, for which he asks judgment.

## II.

"Plaintiff for second count and further cause of action against defendant says that the defendant did, on or about the nineteenth day of January, 1892, accept from him a written application, the same mentioned in said first count and herein referred to, for life insurance on plaintiff's life, in the sum of ten thousand

dollars, payable at his death to his wife, Martha L. Ijams, for and in consideration of an annual level rate premium of $217.20, to be paid by plaintiff on January 19th of each year, for which defendant agreed to issue to him two policies of insurance of five thousand dollars each, upon which said premium should be equally divided and said policies to be renewed and extended at each annual premium during the life of plaintiff.

"The defendant issued policies to plaintiff which it wrongfully and fraudulently, with intent to cheat and defraud plaintiff, represented to plaintiff to be level-rate policies, and falsely represented that the premium of $217.20 per annum would carry said policies during their life and would be renewed from year to year, and were the kind of policies which plaintiff had applied for on a level-rate premium which should not be varied or changed as long as said amount of $217.20 per annum was paid by plaintiff.

" That with said understanding and agreement plaintiff received said policies and paid said premium which defendant accepted each year for the term of seven years, falsely and fraudulently keeping plaintiff lulled into the belief that the statements so made by defendant as aforesaid were true and that it had given plaintiff the kind of policies and assurance he applied for. That when plaintiff had become of an age and in such a condition of health that he could not obtain insurance on account thereof, and before he had any reason to believe said representations and statements were false, and after said plaintiff had paid on said policies the sum of $1,520.40, and complied with all the terms of said agreement, defendant for the first time informed plaintiff that his said policies were not, as it had represented to him, level-rate policies, but were in fact participating premium policies, and that his premium would be raised to the sum of $312 per annum. Plaintiff had no knowledge or information of this intended fraud until such notice to him by defendant on or about

January, 1899. That plaintiff then tendered to defendant his usual premium which had been agreed upon, which defendant wrongfully refused to accept, and after repeated tender and urgent appeal on the part of plaintiff to defendant to carry out its contract with him in good faith, it absolutely refused and declared plaintiff's policies forfeited for non-payment of premium.

"Plaintiff says that he can not now obtain insurance on his life on account of his age and physical condition, to make provision for his family as he was led by defendant to believe he had done, and that all the said false and fraudulent representations so made by defendant as aforesaid as to the kind of insurance plaintiff was getting and paying for was the sole reason for plaintiff accepting the same and parting with his money with a feeling of security for the space of seven years, and that said representations were false and so known to be by defendant and were knowingly, fraudulently and willfully made with intent to deceive, cheat and defraud plaintiff, and said acts of defendant, for said length of time, have forever barred plaintiff from making the necessary provisions for his family by life insurance.

"Wherefore plaintiff says he has been damaged, in addition to the damages prayed for in the first count of his petition, in the sum of five thousand dollars, which he prays to be adjudged against the defendant and in favor of plaintiff and for costs."

At the trial the circuit court sustained an objection by defendant to the introduction of testimony in support of the second count of the petition, with this remark: "Said count does not state a cause of action against defendant," and after hearing the testimony offered in support of the first count of plaintiff's petition, the court gave, at defendant's request, an instruction in the nature of a demurrer thereto that plaintiff was not entitled to recover, whereupon plaintiff took an

involuntary nonsuit, with leave to move to set same aside, which motion was in due time filed and by the court overruled, and the cause has been brought here on plaintiff's appeal from the judgment of the court refusing to set aside its judgment of nonsuit and grant to the plaintiff a new trial.

If for the sake of plaintiff's contention it be conceded that he had the right to rescind and abandon the contract of insurance held by him, on account of fraud alleged, and proceed as he did under the first count of the petition to recover as damages the amount of the premium paid on said contract of insurance rescinded, and at the same time, might also recover upon a second count other damages by him sustained resulting from the same fraudulent act, yet it must be seen at a glance that the damages sought to be recovered under the second count of plaintiff's petition are too remote and speculative to constitute the foundation for a legal cause of action. Under this count, in addition to the damages sought to be recovered in the first count, plaintiff claims to have been further damaged in the sum of $5,000 because of his after inability to make provision for his family by means of life insurance, occasioned by his advanced age and his then physical condition. This at least in plaintiff's brief, is what is asserted to be the foundation upon which rests his claim for $5,000 damages, however uncertain may be thought the purpose of the pleader from a reading of the petition itself. But in whatever light the allegation of this count may be read and considered, it must be apparent that the damages claimed are not the natural, proximate or probable consequences of the fraud alleged, and the trial court was right in refusing to hear testimony thereon. Such damages are so remote and depend for their establishment upon so many other facts and circumstances which the court must know, or impractical of satisfactory or definite proof, that it should be considered as constituting no proper

foundation for a cause of action. What witness could say that but for the security into which the plaintiff was lulled by the defendant's alleged fraud, the plaintiff would or could have procured other insurance on terms as favorable as that given to him by the defendant company in this case? Who could say that any other insurance company upon an examination it might have made into the life and habits of the plaintiff would have taken him as an insurable risk at the time the policy in this case was issued by defendant? Or what proof could have been made that this imaginary insurance company which the plaintiff might have selected (but for the fraud of the defendant) would not have cancelled any policy it then was willing and ready to have issued, or that the plaintiff himself would not for some excuse, captious or otherwise, have refused to pay the premiums exacted of him by the supposed company, as in the case with defendant company? And so on indefinitely, conditions might be suggested about which no satisfactory proof could in the very nature of things be made.

Appellant's next, and his chief contention, however, is that the trial court committed error against him in directing, as it did, a verdict in favor of defendant upon the facts shown, as applied to the averments in the first count of his petition. The disposition of this contention will necessitate a recital of the salient facts in the case, and this will be done by quoting the exact language of plaintiff's chief witness Mumford (who at the time of the issuance of the policy to plaintiff was defendant's solicitor in Kansas City), and that of the plaintiff himself, and by setting out some of the important and controlling features of the policies issued to and received by plaintiff.

The witness W. B. Mumford, after his answers to the usual preliminary questions propounded, testified as follows:

Q.   I will ask you to state the circumstances under

which you took it and all about it and connected with it. A. Well, it was some time ago and I don't know as I can now give the entire circumstances attending the taking of that application. I can give them to you in a general way. I had known Mr. Ijams for a good many years—

Here there was an interruption by defendants' counsel which, when settled by the court, the witness continues:

I met Mr. Ijams—I don't remember exactly where —we met each other frequently on the street and various places, possibly at lunch table, possibly most. any where, and we were discussing insurance, and he told me he wanted me to write him some insurance. I told him I would be very glad to do it and he stated that he wanted a policy that he would pay an annual premium on, and that would not be jumping up and down or changing, and he asked me did I write that kind of a policy, or something like that. I told him I thought I did. I thought we had a policy—I don't remember whether it was a new policy at that time or not, and I told him that I wanted to write him one of what was known as the level-rate policy and that the premiums would be level during life. That was my opinion about it. And I gave him the rate. The rate was satisfactory, but he was not satisfied with that. I told him that I would write—that I had the authority to write "level-rate" in the application, which meant that the premium would remain—would be level—that it was the intention of the company to keep that level.

The Court: What was that? A. I told him that I had authority to write into the application the words "level-rate" and that it was the policy of the company —it was the intention of the company—to keep the premium level by the application of the surplus and there was no question about that at all. Well, he said he kind of questioned my authority in regard to writing the words "level-rate" in the application. I told him

I had it. "Well," he says, "if you will get authority from Mr. Homans and show it to me, that you have got the right to write 'level-rate' in the body of this application, and that is what it means, that this surplus will be applied to keep this premium level, why, I will take the policy." That is about what was said. And I wrote to Mr. Homans.

Q. Who was Mr. Homans? A. Mr. Homans was president of the Provident Savings Life Assurance Society. I wrote to Mr. Homans and I received an answer from him in regard to the matter. I went over to Mr. Ijams and I told him, "Now," I said, "here is a letter from Mr. Homans," and I handed it to him and he read it and we both read it together—read it several times—he was rather skeptical about it. "Well," he says, "I reckon that is satisfactory. That is all right," and so on. "I will take the policy. I have known you a long time, and everything like that, but I would rather have the authority from the company." "Very well," I says, "you have got it now." And I wrote the application and wrote the words "level-rate" into it.

Q. Now, what did you mean by that when you wrote it? A. I meant just what I said—that it was the intention of the company to apply the surplus on that policy to keep that premium level—that was their intention.

Q. Well, how long was it to be level? A. Because if it hadn't been their intention, we would have written the other policy. There was another policy written where the surplus was not held and applied to keep the premium level. It was applied in another way. And the result is that these are—they call these the level-rate policies, because this surplus was held and applied to keep this premium level, and according to the figures and according to the data held out to us agents by the company, we could figure it out ourselves. It went to show that the proper application of this sur-

plus fund would keep this policy level during his life-time or up at least to the age of seventy, although it was not called an age of seventy policy; but there was no way that we could figure it but what it would be a safe proposition to keep it to the age of seventy any-how, but the intention was to keep that policy level dur-ing his lifetime by the application of that surplus fund.

Q. When you wrote to Mr. Homans, did you tell him of the position of Mr. Ijams? A. I wrote to Mr. Homans and told him that Mr. Ijams would not accept a policy unless there was authority for me to write the words "level-rate" in that policy.

Q. And that it was to keep level during his life-time?

Mr. New: You mean in the application—write in the body of the application? A. The words "level-rate."

Mr. New: When you said policy, it was a slip of the tongue? A. Yes, sir.

By Mr. Hollis: Q. What did he tell you, if any-thing, other than giving you the authority— A. Well, the letter I received, I don't remember the contents of it at all, no more than that it was sufficient for Mr. Ijam and myself at the time. We both took it and we both read it, and on the strength of it I wrote the words "level-rate" in that application and he accepted the policy, but the wording of the letter I don't remember at all.

Q. Well, what did you mean by that "level-rate?" A. I meant just what I said. I meant that that policy was a policy that the company intended to keep the premiums level on by the application of that surplus fund.

Q. And it was never to raise or fall, so far as he was concerned? A. That was their intention—that was the intention of the company at the time.

Q. That was their contract? A. That was the

contract or stipulation, that it was the intention of the company to keep that level with the application of that surplus fund. Now, it remained with them to do it or not to do it—if it could be done.

Q. Now, you took the application then? A. Yes, sir.

Q. After that, and sent it on? A. Sent it on.

Q. And they returned the policy? A. They returned the policy.

Q. To you? A. To me, and I gave it to Mr. Ijams and he paid me for it.

Q. And was there any other understanding after that understanding that it should be a level-rate premium policy? A. I don't think it was discussed at all after we got the policy. The matter was discussed all before. I don't think there was any discussion in regard to the matter at all, any further than the mere payment of it. I don't remember any discussion in regard to it. I know the premiums remained the same during the time I was the general agent and consequently there was nothing to discuss — nothing was ever brought up.

Q. Do you remember how long it remained as he had provided for? A. No, I don't know anything about that. It was along in '92 and I was general agent until '95 or '96; I suppose, two or three years or so.

Q. Do you know what became of that letter that you received from Mr. Homans? A. I have no idea. All those things were filed in their regular way in the office.

Q. By the way, I don't believe I asked you who Mr. Homans was? A. Yes—he was the president of the company.

Q. Well, where did you leave the letter? A. Oh, in our regular files.

Q. In your office? A. Yes, we had regular files for everything.

Q. And when did you leave that office? A. I think it was sometime in July or June, somewhere in 1896, or 1895—I don't remember—I think it was in '96—sometime in '96, I think, June or July. I associated myself then with the New York Life and then went to the American.

Q. Now, when you took the policy over there, was an application attached to the policy—wasn't there when you took it over to Mr. Ijams? A. I think the copy of the application was right in the back of the policy.

Q. Then what did you do? A. That is the Provident Savings' custom—always to have the application on the back of the policy—so that the party receiving the policy can see the exact application that was written.

Q. What did you do in regard to calling his attention to that application and showing him that it was the same as the one that he had sent on? A. I showed it to him and he read it.

Q. It was the same? A. It was the same thing —an exact copy of it precisely.

Q. With the words "level-rate?" A. Written right in the body of the application.

Q. Now, when you took the policy to Mr. Ijams for delivery, what did you do or say, at that time? A. Oh, I don't remember exactly what I did or said, but it was natural, I suppose, for me to open the policy and show it to him and I told him that I had done just what I had agreed to do—that there was his policy with the "level-rate" written in the application just as he wanted it.

Q. And you showed it to him where it was written in the application? A. Yes, and that I had gotten him just what he wanted, and I thought I had.

Q. And you delivered it to him. Then what did he do with it? A. I don't know. I believe he put it in his pocket. There was no discussion about it at

all, at that time, any further than as soon as he saw that the application was just like the one he signed, that was sufficient and I showed him that the application in the policy was just like the one he signed and we read it together.

Q. You had quite a conversation with Mr. Ijams before getting that letter from the company, did you not, as to the terms of the policy to be issued? A. Oh, we discussed that considerably, all the time. That is reason we wrote the letter to New York.

Q. And by that letter you were able to satisfy him that this premium should remain the same during his life and the period of the policy? A. Yes. I satisfied him that it was the intention of the company to keep that premium level.

Q. And never let it raise or fall? A. It was perfectly satisfactory—he was perfectly satisfied with the intention of the company. He got what he wanted and he believed that president Homans was the greatest living insurance man in the world and thousands of others believed it—like myself—and that it was the intention of the company to keep that premium level.

Q. During his life? A. And that the surplus applied to that premium would keep it level.

Q. And he had nothing to do with that surplus and didn't want anything to do with it? A. No, he didn't want any dividend. He wanted the surplus applied to his premium to keep it level.

Q. Now, was that the terms upon which he took it? A. Yes, sir.

Q. Explain, as an insurance man, what is the meaning of the term "level-rate?" A. It is simply a tricky term, to be truthful about it — I am on the stand. The word "level-rate," as it is understood by the public, by men that buy these policies, is that it it supposed to be level, that is, unchangeable, that they stay level.

Q. That is, the same rate agreed upon remains

the same? A. Stays level—that is the understanding of it, that they remain level, that is, the annual premium. The policies so written are known as level-rate policies and they are supposed to be level-rate policies, and they are level-rate policies so far as it is possible for the company to keep that premium level with the application of the surplus fund. If the surplus fund is handled judiciously, as the company expects it to be handled, and upon which they base their policy, then these premiums would remain level. But if the surplus fund is not handled judiciously, or some unforeseen condition arises where the necessary application of this fund is drawn off, drawn away from that policy in some sort of way, why, as a matter of course, then that premium is subjected to its loss.

Q. Now, you may state how this application was taken.

Mr. New: Have you finished your explanation? A. As to the level-rate policy? Yes, That is what the words "level-rate" means, so far as I know.

Thomas H. Ijams, called as a witness in his own behalf, testified as follows:

Q. Give your name to the stenographer? A. A. Thomas H. Ijams.

Q. Your age? A. Fifty-nine.

Q. Place of residence? A. Kansas City, Missouri.

Q. And business and occupation? A. Deputy Internal Revenue Collector.

Q. You are the plaintiff in this case? A. I am.

Q. (Handing witness application) I will ask you to look at that application and state whether that is the application that you signed for a policy of insurance? A. Yes, it is.

Q. Who did you sign that with—that is, who was the agent? A. W. B. Mumford, the gentleman who just testified.

Q. State now under what circumstances that ap-

plication was signed? A. What do you mean — the conditions leading up to it and all?

Q. Yes, and what representations were made to you that induced you to sign it?

Mr. New: If your honor please, that is objected to as incompetent, irrelevant and immaterial. Whatever negotiations were had or inducements held out are supposed to be merged in the application for the policy.

The Court: I will hear it subject to the objection. I can pass on it when I come to the instructions.

To the ruling and action of the court the defendant at the time duly excepted.

A. Do you want the conversation leading up to it and the whole matter?

Q. Yes, state all that pertained to it? A. I think it was in December, '91. I was considering the matter of taking additional insurance, and being personally acquainted with Dr. Mumford, and meeting him, I asked him in reference to this policy that he had spoken about prior, and he explained the matter, but it was not clear to me as to the term "level-rate," and I think I expressed confidence in him, if there were no others, that he would outlive me and remain with the company; that I would be satisfied to risk his taking care of the matter, but that was uncertain like other matters, and I asked him, having special confidence in Mr. Homans from what I had heard of him as an insurance man, if he would write a letter to the president of the company, and he authorized him to write the words "level-rate" in the application; and the explanation of Mr. Mumford that the application would be attached to and be a part of the policy and a part of the contract, and that Mr. Homans should state that the terms "level-rate" should mean that the same premium at which I commenced should be continued during my life, that I would take the policy. I presume he wrote the letter—he so stated—and later on he came

to me with a letter under the company's letter head, with Mr. Homans' name to it, in which it stated that, acknowledging the receipt of his letter, and saying to accept the application and assure me that the terms "level-rate" meant a continuous level-rate during my life or while I kept the policy in force, and on the representation of the agent, and Mr. Homans' written statement, I accepted the policy, and paid for it, and paid continuously then for seven years without any question.

Q. Now, when did you first learn after that that you had not a level-rate policy in that application? A. In December, 1898. It was the company's custom to notify us about a month prior to when the premium fell due, and the notice of December, 1898, was the first intimation I had of a raise in it, in which they notified me that premium due January 19, 1899, would be $312 and possibly a few cents. It was the first intimation I had of it.

Q. Now prior to that time, had you kept your premiums paid satisfactorily to the company? A. Yes, sir.

Q. There had been no question raised about it anywhere? A. Not a particle in the world.

Q. What did you do then on receiving that information from the company? A. Why, the matter was held in abeyance some little time, considering, and finally on pay-day—we had a month to consider the matter—and on pay-day we went in, and in the presence of two witnesses tendered him the $217.

Q. The last tender you made was what date? A. July 19, 1900.

Q. Who did you make that tender to? A. To Mr. Gant, the agent of the company.

Q. What was said when you made such tender. A. Why, he told me, so far as the tender was concerned, they waived that—they cared nothing about it, it was useless to bother myself by coming in and making the

tender, or to bother my friends to come in with me as witnesses, that the policy was dropped as far as the company was concerned and there was no use to have any feeling about it or any further communication about it—the matter, so far as the company was concerned, was ended.

Cross-Examination by Mr. New.

Q. The application was made out, wasn't it, as Mr. Mumford has testified, after this letter was received? A. Yes, and the conversation him and I had.

Q. Yes, and the words which you found in your application were written in, as you have stated, pursuant to that letter? A. Why, after the conversation, Mr. New, he brought me—he wrote his letter and he brought the answer to me and read it to me and then handed it to me and I read it and he gave his explanation and I told him that was satisfactory, with his assurance and the assurance of the president of the company.

Q. Just a moment. After the letter— A. (Interrupting.) I am just going to tell you that. Upon his assurance that the terms "level-rate" would be put in the application and a copy of it would be a part of the contract and that the words "level-rate" meant a continuous or the same rate during life, why, I accepted it, and then he sat right down and wrote the application, which, I presume from the date, was the sixth of January, 1892.

Q. That is what I am trying to get at. A. Yes, it was afterwards.

Q. That the application and the words were written in the application as you understood it, pursuant to this letter—that is what the letter authorized, as you understood it? A. Yes, sir.

Q. He wrote those words in the application? A. Just as quick as we got through considering the letter, I laid it down on my desk and he wrote out the application.

Q. Then after the application was written and signed by you, it was placed in Mr. Mumford's hands? A. Yes, sir.

Q. And of course that was the last you ever saw of it? A. Until I saw the copy with the policy.

Q. And then, pursuant to this application, these two policies came back and Mr. Mumford delivered them to you, as he testified? A. Yes, he brought them in and just opened them up and showed me he had carried out this specific part of the agreement and con-- tract and the policies were doubled up and I accepted them as reliable and put them in my desk and paid for them, and there was nothing—no controversy about it until Mr. Homans died and the new president went in and they raised the rate.

Q. Now, in order that this may be clear, I can get at it probably quicker—your deposition was like- wise taken in this case? A. Yes, sir.

Q. On pages 4 and 5, I will ask you if these ques- tions were asked you and if you remember having given these answers:

"Q. Did you make any examination of it at that time? A. Why, I looked at it to see that the names and amounts was as agreed upon; that the terms 'level-rate' were written in the copy of the application according to agreement"—referring to the time it was delivered to you—probably I better go back a little? A. That is all right. I understand you.

"Q. Now, who delivered this policy to you? A. Mumford, the agent of the company.

"Q. What did you do with it when he gave it to you? A. I put it away, I presume.

"Q. Did you make any examination of it at that time? A. Why, I looked at it to see that the names and amounts was as agreed upon; that the terms 'level- rate' were written in the copy of the application ac- cording to agreement."

Q. You made those answers? A. Yes, sir.

"Q.   Where were the terms 'level-rate' written?
A.   They were in the application, and it was made a part of the policy.

"Q.   You say that the terms 'level-rate' were written in the application?   A.   Yes, sir.

"Q.   Now, the application was sent on to the company, and was there any policy come back after that time?   A.   Yes, sir; with a copy of the application attached to it.

"Q.   The copy of the application was like the application that you had sent forward?   A.   Yes, sir.

"Q.   And you examined that copy of the application when it came back to you?   A.   Yes, sir, we went over it together there in my office, and I was satisfied that it was all right according to Mr. Homans' letter; he had those words written in there according to Mr. Homans' letter, and I accepted it and gave him a check for it."

A.   Yes, that all means simply as to the words "level-rate."   That is the only examination there was —that and the name and amounts.

Q.   Those questions were asked you and those answers given?   A.   Yes, so far as you have gone; yes.

Q.   Now, Mr. Ijams, you stated, I believe—that your business—that you were a Deputy Revenue Collector?   A.   Yes, sir.

Q.   How long have you been in that position?   A. Why, since September, 1900, I think.

By Mr. New:   Q.   Just one more question, Mr. Ijams, if you will go back just a moment.   In the taking of your deposition, this question was asked you and this answer given and I asked you whether it was true. I will read it to you, and you can say whether it was true or not?   A.   In what sense do you mean true— as it was asked and answered?

"Q.   I mean did you just read it over then, or did you take it home with you (referring to the application)?   A.   Oh, no; I examined it carefully and told

him I was satisfied with it with one exception—that was, I wasn't willing to take his statement as to the rate being level, and that I was not willing to make the application upon his simply writing in the words as he showed me would be done of yearly renewable term; I wasn't satisfied with that; I knew Mr. Homans by reputation, and regarded him as the best actuary, and perhaps the most honest and conscientious man in the insurance world, and I told him if he would write Mr. Homans, and Mr. Homans would authorize him to write in the application the words 'level-rate,' with the assurance from Mr. Homans that the rate would be maintained at the price agreed upon during my natural life, that I would make the application and take the policy. I don't know what time he got his letter, but later he came to me at my office in the New York Life Building, and sat down beside me and took out a letter on the company's letter head, and read it, telling him to take applications upon those conditions, that he might write in the words 'level-rate' and assure the applicant that the rate would be maintained level during the lifetime, and it had Mr. Homans' name signed to it. Upon the strength of that letter, I told him all right, it was perfectly satisfactory. 'Get out your application and I will sign it and take the policy.'" You made that answer? A. I presume so; yes, sir.

Redirect examination by Mr. Hollis.

Q. What amounts did you pay each year on these policies from the time they were issued in January, 1892? A. I think the first two years the payment was $217.20 a year. I think after the second year it was changed to semiannual payments and there was a little added for interest there, which made it—the payment—a little larger. It amounted to $226 per year.

Q. Well, that was just on account of your changing the time of payment? A. Yes, that was all.

James A. Gresham, called as a witness on the part of the plaintiff, testified as follows:

Direct Examination by Mr. Hollis.

Q. What is your age? A. Fifty-eight.

Q. Where do you live? A. Kansas City, Mo.

Q. How long have you lived in Kansas City? A. Since 1886.

Q. What is your business? A. Life insurance agent.

Q. How long have you been in the life insurance business? A. Well, off and on about ten years.

Q. Been making a specialty of it? A. Yes, sir.

Q. I will ask you what is the meaning of the term "level-rate premium" in the insurance business? A. My understanding was that it was to remain level—no change in the rate at all. That was always my understanding.

Q. Not become higher or lower, but be one and the same? A. Yes, sir; always the same.

The following is a copy of the two policies issued by defendant company to the plaintiff, that were read in evidence. The two policies are identical and each one for five thousand dollars.

"Number 43368.                    Amount $5,000.

THE

PROVIDENT SAVINGS LIFE ASSURANCE

SOCIETY

of New York.

"In consideration of the stipulations and agreements in the application herefor and upon next page of this policy, all of which are part of this contract; and in consideration also of the payment of one hundred and eight dollars and sixty cents, being the premium hereon for the first year, promises to pay to Martha L. Ijams, wife of Thomas H. Ijams, or to her legal representatives or assigns, the sum of five thousand dollars, (less any indebtedness on account of

this policy), within sixty days after acceptance, at the office of the Society in the City of New York, of satisfactory proofs of the death of Thomas H. Ijams of Kansas City, county of Jackson, and State of Missouri (the insured under this policy) provided such death shall occur on or before the nineteenth day of January, A. D. 1893.

"And the said society further agrees to renew and extend this insurance upon like conditions, without medical re-examination, during each successive year of the life of the insured, from date hereof, upon payment, on or before the nineteenth day of January in each year, of the renewal premiums.in accordance with the schedule rates less the dividends awarded hereon.

"In witness whereof, the Provident Savings Life Assurance Society of New York has caused this policy to be signed by its president and secretary, at its office in the city of New York, on this, the nineteenth day of January, A. D. one thousand eight hundred and ninety-two."

On the second page of both of plaintiff's policies is set out in bold type a schedule of rates showing the yearly premiums required to renew each one thousand of insurance named in the policies up to the time when the insured has reached the age of sixty, and immediately following said schedule of yearly renewal rate charges, is this paragraph: "No policy is issued at an age higher than sixty years. *Schedule rates on the same basis as above, subject to reduction of dividends, will be furnished on request.*"

In the application for the policies sent by plaintiff to defendant company (which application, as usual, was made out on a blank provided and sent out by the company for convenience of all parties who desired to procure insurance) is found in print the following: "State here the exact amount and kind of policy desired," and in the space following, that had been left blank for the applicant for insurance to fill in, we find

these words written in by the plaintiff, "Yearly re-
newal term level rate," so that as completed, the para-
graph appears in the application, attached to and made
a part of the policy, "State here the exact kind of
policy desired. Yearly renewal term level rate."

If for the present we shall ignore the fact that
plaintiff by his receipt of and continued holding of the
policies in question for seven years without objection
to any of their terms and provisions, should be deemed
to have adopted and agreed to them, we are unable to
find in the testimony of the plaintiff or his witness
Mumford, any evidence of fraud or misrepresentation
on part of defendant or its agents, to warrant a verdict
against defendant and in favor of the plaintiff, on
either count of his petition. The testimony of the
plaintiff himself, as also that of his chief witness,
through whom he conducted the negotiations for the
policies in question, was that plaintiff insisted not only
that he wanted a level-rate premium policy, but that
he wanted his application, that was to be sent to the
company as a basis for the issuance of the policies to
him, to have inserted therein the words "level-rate
premuim policy," so there might be no mistake as to
the kind of insurance he desired and expected to be
written up for him by defendant company.

If there is anything made certain from the testi-
mony it is that plaintiff wanted a "level-rate premium
policy." That exact character of policy he got, as the
same is known to the insurance and the business world,
and according to the plan as same was explained to
him by the agent Mumford, at the time he was contract-
ing for insurance. The only trouble with it was, that
in after years, when for some cause or causes not ex-
plained by the testimony, the hopes of the plaintiff, the
expectations of the company, and the prophecies of the
agent Mumford failed to be fully realized in the actual
working of the plan of these level-rate premium poli-
cies, and the plaintiff was called upon to pay the regu-

lar premium as charged in the schedule of rates fixed
and agreed upon in the policies for that particular
year's renewal, unaided, as he had theretofore been in
making his annual renewal premium payments, by
having applied for his benefit the annual dividends
awarded thereon to help reduce the increase on the
renewal charge named to the level of the first premium
charged in the schedule of rates fixed in the policies;
that is to say, for some reason not fully shown by the
testimony, no dividends had been declared on the
policies of plaintiff for the year 1898, that was or could
be used to reduce, or bring the fixed renewal premium
charge prescribed in the policies for that year, to the
level of, or down to the amount of the premium charged
in the schedule of rates for his first year's insurance,
as is contemplated in the general plan of what is called
level-rate insurance, like that issued by defendant to
plaintiff in this case.

The policies issued to and held by plaintiff were,
however, none the less level-rate premium policies ac-
cording to their terms and provisions, and by which
alone we must now consider them. And here it might
be well to suggest a fact that appellant seems to have
entirely ignored, and that is, that it is the conditions
contained in the policies, regulating the manner by
which the annual renewal premiums named therein, are
to be met and provided for in part out of any other
funds, that has given to policies like these the name
and designation "level-rate policies," and not the fact
that a fixed definite result will always be accomplished
in the actual working out of the plan.

The character of a policy, or the name by which
it is designated or known, is not changed by the mere
fact that at a particular year, or for a series of years,
the profits earned by it, or the dividends declared
thereon, become insufficient to reduce the prescribed
annual renewal premium named and charged for that
year, or for a series of years, to the level of the first

premium charged. As said, the general plan of a policy of insurance gives to it its name and designation, and this is not changed because of the fact that in the actual working of the plan that result is not attained in every instance.

Since then the plaintiff got the exact character of policy he requested in his application to defendant company for insurance, it would seem, therefore, that no fraud can be said to have been perpetrated upon him in that particular. But, says the appellant, if to me a level-rate policy was issued (and by me accepted and held for seven years without objection), as the same is now understood by defendant company, and if it be also true that its terms and provisions were not improperly or fraudulently withheld from me by defendant, or its agent, when the policy was delivered, still its terms and provisions were improperly and wrongfully interpreted and construed for me by the company's agent, and by relying upon that construction I have been defrauded by being led to believe that I was getting a policy in which uniform annual renewal premium charge or rate would be required of me throughout the life of the policy, or so long as I wished to keep the policy in force. On this theory of plaintiff's case we think the trial court very properly sustained the demurrer to the testimony as offered. Plaintiff nowhere in his testimony says that he was told by the agent Mumford, or by the company, that he would receive a policy in which a fixed and definite annual renewal premium charge would be provided and designated therein. In fact, all the testimony offered by the plaintiff shows that just such a policy as that was not in the contemplation of either the plaintiff or the agent Mumford at the time the policy was being negotiated for, notwithstanding plaintiff's repeated declarations in his testimony that he was assured that the term level-rate would be inserted in his application to the

company for the insurance sought and would become a part of his policy, and that the term level-rate meant "a continuous level-rate during my life or while I kept the policy in force."

Take plaintiff's testimony upon this subject in connection with that of the witness Mumford and but one fair inference can be drawn, and that is, that plaintiff knew that he was to get a level-rate annual renewable premium policy, just such as was delivered to him by the defendant company, and such as he accepted and enjoyed the protection of for seven years without murmur or complaint. Doubtless the plaintiff expected and thought he was getting a policy upon which a uniform premium charge would be collected from him, for that would be in accord with the explanation of the plan of such insurance, as was given by the witness Mumford to plaintiff when he was discussing with plaintiff the merit of such insurance, as well as in accordance with the manifest purpose of the company itself as shown in the terms of its policies issued (so long as the company might be successful in its business operation, and be able to declare dividends upon said policies equal to the increased cost of the latter years' insurance). Thus in each policy accepted and held by plaintiff, it is provided that the company will renew and extend this insurance during each successive year of the life of the assured from the date thereof upon the payment by him "on or before the 19th day of January in each such years, of the renewal premiums, in accordance with the schedule, less the dividends awarded hereon."

It would be impossible from a careful study of the testimony of the plaintiff to believe that he would have gone to the trouble of having his friend Mumford explain to him so carefully what was meant by the term level-rate policy, and after getting his explanation, to further insist that Mumford should get a letter from

the president of the company, stating that the company was authorized to issue such a policy as the agent had explained to him, if his only purpose was to procure insurance upon which a fixed and definite annual premium charge would be made and provided therein. A fixed premium policy is the kind of insurance with which all men are familiar who know anything of the business of insurance. It could not be that a man of plaintiff's wide experience in business, and who had himself at one time sold insurance, had gone to all the trouble he did for the purpose simply of ascertaining if a policy could be written on his life by the payment of a definite, fixed and uniform annual premium. That any child would know could be done who ever heard of life insurance, or knew anything of its plans or purpose. A level-rate premium policy meant to plaintiff something other than a policy in which a fixed and definite annual premium charge was to be named therein, if we are to give to his conduct any meaning whatever, or if we shall attach any significance to the declarations of the witness Mumford. From all the testimony given in this case it could be no less certain what the plaintiff wanted and what he contracted for in his negotiations with the witness Mumford, than it is certain what he actually got, and that was, a level-rate annual renewable premium policy, which, as before said, according to the explanation of the witness Mumford, as well as by the terms of the policy itself, is a policy on which the regular annual renewal premiums provided, are to be kept down to a level with, or are to be brought down to the level of, the premium charged for the first year's insurance, by the application of the profits earned on the policy, to that end; or as the plan is explained in the language of the policy itself, the renewal premiums are to be paid by the insured "in accordance with the schedule of rates" (set out in the policy) "less the dividends awarded thereon." Plaintiff got the exact character of policy he ap-

plied for. The identical policy, the workings of which, the witness Mumford had explained to him, and that pol- icy he accepted and kept for seven years perfectly satis- fied therewith, and all that can be said from a reading of his testimony at this time is, that he got a policy, the workings of which, after the end of seven years, failed to reach his expectation, inspired as it doubtless was by the predictions and prophecies of the agent Mumford in his elaboration and praise of the plan of level-rate insurance. But independent of what may now be thought of the testimony bearing upon the questions as to what kind or character of insurance plaintiff and the agent Mumford had been discussing prior to the issu- ance of the policies in question, and as to what terms and conditions it was to contain, it is to be noted there is not to be found a word of testimony in the entire record, that either the agent Mumford or the defend- ant company, at any time practiced or attempted to practice any fraud whatever upon the plaintiff, where- by he was induced to accept or receive the policy as finally prepared and written for him, without reading or fully acquainting himself with all its terms and pro- visions, and without such proof made all testimony as to the anterior conversations and dickerings between plaintiff and the agent Mumford, as to what was to be the terms of the policy to be written, must be brushed aside as of no avail, since the law will presume that all prior conversations and parol negotiations leading up to the making of the written policy have become merged in its subsequent and final consummation and that said policy as written contains the entire engage- ment of the parties, and by which alone their intentions must be governed and determined. While counsel for appellant recognized the correctness of the rule gen- erally, that prior parol negotiations are merged in the written contract subsequently made, and that all parties must be held bound by what the subsequent writing contains, and not by the particular under-

standing of its provisions by either party, he seeks to break its force as applied to the present situation, by the suggestion that the words "level-rate" as used in the application for the insurance issued, are technical words, and that being such, the construction placed upon them by the agent Mumford should bind the company now, and for that reason the plaintiff was entitled to have defendant's construction of the meaning of the words used in the application (that was made a part of the policy) given in evidence, and to have the company bound by that construction. If the term level-rate, as used in plaintiff's application to defendant company to designate the particular kind and character of insurance policy he desired the defendant to write, as distinguishing it from some other character or kind of insurance written by the company, may be said to be technical in that sense; the language of the policy wherein is described and particularized how the annual renewal premium charges made therein, are to be paid, and the amounts thereof designated, is not technical, ambiguous or of a doubtful meaning, and by these provisions the plaintiff and defendant must now be governed and controlled. The language of a policy could not well be made more definite, clear or certain, than that found in plaintiff's policies upon this subject.

It reads: "And the said Society further agrees to renew and extend this insurance upon like conditions, without medical re-examination, during each successive year of the life of the insured, from date hereof, upon the payment, on or before the nineteenth day of January in each such year, of the renewal premiums in accordance with the schedule rates less the dividends awarded hereon."

The schedule of yearly renewable rates required to renew each one thousand dollars of insurance, provided for in the policy, is then set out on the second page of the policy, in figures so plain, conspicious and

orderly arranged that a misunderstanding of their meaning is not possible to one who would give to their consideration any thought or attention whatever. Thus in the schedule of rates, we find that at the age of 49 (the age of plaintiff when he took out the policies in question, and paid his first year's premiums thereon), the premium rate is fixed at $21.72 per thousand (or one hundred and eight and sixty-hundredths dollars for five thousand dollars of insurance, the amount named in each of the policies received by the plaintiff) ; and at the age of fifty, by this schedule, the premium to be charged is fixed at $22.64 per thousand of insurance carried. And so on in this schedule of rates with each advancing year, an increased annual premium charge is designated as necessary to be paid to keep the policy in force, until the rate charged for one of the age of 57 is reached in the schedule (the age at which plaintiff refused to pay the premiums demanded of him), when the amount named for each one thousand dollars of insurance carried by the company, is set out in conspicuous figures at $33.25, the exact amount demanded of plaintiff by defendant, on account of his policies, when he refused longer to pay thereon and abandoned the provisions of the insurance furnished him thereunder.

As said, the provisions of the policies in question, in which are designated plaintiff's obligations and defendant's responsibilities, are clear, concise and unambiguous. They are expressed in words and figures in no sense technical, and by them plaintiff's right and obligation must alone be determined. If the words "level-rate" as found in plaintiff's application to defendant company, designating the kind of insurance he desired the company to issue to him, are technical words, it is only in the sense that they designated one plan of insurance policy from a policy of some other plan or character, and could have nothing to do with the question of the amount of the annual renewal prem-

ium charges to be named and designated in the policy to be written. The binding force of a written contract is not to be found in the technical name endorsed upon its back, to distinguish it from other instruments of a like general character, and by which it is to be known and designated in the business world, but must be determined from the language and provisions found in the body thereof.

So, if the word level-rate, as used in plaintiff's application for insurance to defendant company (which application, by its terms, was to be attached to and made a part of the policies in question) to designate the particular kind or plan of insurance policies plaintiff wished the company to issue to him, are thought to be technical words, and this meaning had been improperly or falsely construed by the agent Mumford when the matter of plaintiff's purposes and desires to take out insurance with defendant company was being discussed, that did not and would not relieve plaintiff from the responsibility of examining for himself, to ascertain if the policies, when delivered to him by the company, did or did not contain provisions contrary to his understanding of the explanation of the plan of "level-rate insurance," as same was made to him by said agent Mumford. Hence since no fraud or deceit was practiced or attempted to be practiced upon plaintiff to induce him to accept or receive the policies without examination, to ascertain what were their provisions and terms, and since he has taken them and enjoyed the protection they afforded for seven years, without complaint, the trial court was right, for that reason, in giving its instruction that, upon the testimony offered, plaintiff was not entitled to recover.

The judgment of the circuit court is therefore affirmed. *Brace, Gantt, Valliant* and *Fox, JJ.*, concur; *Marshall, J.*, dissents; *Burgess, J.*, absent.